**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-506 (TNM)** |
| **v.** | : | |
| | : | |
| **ANDREW C. ERICSON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Andrew Ericson to 60 days of incarceration and $500 in restitution.

## I.       Introduction

The defendant, Andrew Ericson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' worth of property damage. The defendant stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Andrew Ericson pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a jail sentence is

appropriate in this case because the defendant (1) penetrated the U.S. Capitol all the way to the Speaker's conference room and office space; (2) trivialized the level of his intrusion by posing with his feet on the Speaker's conference room table and taking a beer out of a mini refrigerator; (3) saw police officers overrun by the crowd of rioters; (4) recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing; (5) deleted his Facebook and Snapchat[1] accounts, although it is not clear this was done in an attempt to destroy incriminating evidence; and (6) appears to have a general lack of remorse, stating only that he would not have entered the Capitol knowing what he knows now.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we turn to the defendant's conduct and behavior on January 6.

*Andrew Ericson's Role in the January 6, 2021 Attack on the Capitol*

Andrew Ericson drove from Oklahoma to Washington, D.C. to be present for the rally on January 6, 2021. Prior to entering the Capitol, Mr. Ericson took video showing individuals scaling the wall of the west side of the Capitol, police carrying someone away on a stretcher, and throngs of rioters moving up the stairs and into the Capitol as someone yelled "they broke through." Mr. Ericson cheered outside and inside the Capitol.

---

[1] It is possible that Defendant Ericson removed all of the content of his Snapchat account and placed it in a private status rather than completely deleted the account. Either way, it has the same practical effect. Defendant Ericson deleted his Facebook account completely.

Andrew Ericson entered the west side of the U.S. Capitol Building. Based on a video he posted online, it appears he entered through an open door at approximately 2:24 p.m. His cell phone utilized a cell site consistent with providing service to a geographic area that included the interior of the U.S. Capitol as early as 2:49 p.m. and as late as 3:03 p.m. While inside the Capitol, Defendant Ericson took video of his presence in the Crypt, Rotunda, United States House of Representatives Speaker's Conference Room (H-230), and office space that included desks, computers, and a Christmas tree. Defendant Ericson posted videos and images from January 6 to Snapchat, which were then reported by observers to law enforcement.

The defendant's conduct inside H-230 is particularly troubling. He sat at a conference table with his feet on the table, posing for a photograph that he posted on his Snapchat page as depicted below.



While inside H-230, he also took a "selfie" photograph of himself in a mirror that he also posted to his Snapchat page, as depicted below.



Finally, Defendant Ericson took a Corona Light beer out of a mini refrigerator. The video cuts out before showing whether Mr. Ericson started to drink the beer, although he later told someone that is what he did.

In verbal and electronic communications with associates after January 6, the defendant admitted he had been inside the U.S. Capitol on January 6, 2021. In entering his plea, Andrew Ericson has admitted that he knew he did not have permission to enter the Capitol Building and that he acted with the intent to parade, demonstrate, or picket within the building. *See* Statement of Offense ¶ 10.

*Social Media Posts*

The government learned of the defendant's presence in and around the U.S. Capitol Building as a result of his uploads to Snapchat of video and photographs showing his presence in the Capitol. Early in the investigation, a tipster reported seeing videos Andrew Ericson posted to his Snapchat account of his entrance into the Capitol and presence inside. The tipster was able to record portions from Defendant Ericson's Snapchat account that were then provided to law enforcement. This included video from 2:21 p.m. showing people outside of the Capitol Building as a group of rioters climbed the stairs to enter the Capitol (Exhibit 1). It also included video from 2:24 p.m. from inside the Capitol showing a large number of rioters walking through the hallways (Exhibit 2). The tipster reported that s/he did not see Mr. Ericson commit any violent acts but did hear him screaming and yelling during the recording. The tipster also reported that, although s/he was able to record only two segments from Snapchat, Mr. Ericson posted approximately 10-15 videos and photographs of him in and around the Capitol Building. Law enforcement also obtained additional video clips that Defendant Ericson posted to Snapchat, including video from inside the Speaker's Conference Room. In addition to Exhibits 1 and 2 referenced above, three additional pertinent videos (Exhibits 3-5) are also being submitted.[2]

After January 6, 2021, Defendant Ericson removed the content of his Facebook and Snapchat accounts, although it is not clear this was done for the purpose of destroying

---

[2] These exhibits are being provided via e-mail to the Court and counsel. They consist of videos posted to Andrew Ericson's Snapchat account that were captured by witnesses and provided to law enforcement. Exhibit 1 has a time stamp of 2:21 [p.m.] and is 26 seconds of footage outside on the west side of the Capitol Building. Exhibit 2 has a time stamp of 2:24 [p.m.], is 15 seconds long, and appears to capture the moments before and after the defendant's entry into the Capitol. Exhibit 3 is 1 minute in duration and shows footage both outside and inside the Capitol. Exhibit 4 is 39 seconds and has footage from inside the Crypt, office space, H-230, and the Rotunda. Exhibit 5 is 8 seconds and shows the defendant removing the Corona Light beer from the mini refrigerator.

incriminating evidence. Defendant Ericson told agents at the time of his arrest that he had received some "ugly reactions" on his social media accounts, causing him to "lock[] them down." Defendant Ericson also told agents at that time that he used Twitter and some other social media accounts to post pictures and videos during the events at the Capitol.

*Andrew Ericson's Statements to Law Enforcement*

As just referenced, Andrew Ericson made some statements when agents were present at his residence on January 22, 2021 to arrest him and execute a premises search warrant. Mr. Ericson invoked his right to remain silent and did not participate in a custodial interview after his arrest. However, after being shown the premises search warrant, Defendant Ericson noted that his room was messy and showed law enforcement where they could find the pertinent clothing items. When law enforcement told Defendant Ericson that his cell phone would be seized and that it would be helpful if he would unlock it or provide the passcode, he said he did not want to provide the code.

In compliance with a condition of the plea agreement, Andrew Ericson did interview with FBI agents on October 22, 2021. He provided additional details about his involvement in the events of January 6, 2021 and appeared to be forthcoming. In that interview, Mr. Ericson explained that he drove his mother's vehicle from Oklahoma to Washington, D.C. with a friend.  They left Oklahoma on January 5, 2021 and arrived in Washington, D.C. around 2:00 a.m. on January 6. Later that morning, Mr. Ericson did some sightseeing of monuments before arriving to the rally near the White House during the end of former President Trump's speech. Mr. Ericson reported that he did not witness the Capitol being breached but saw others entering and followed them inside. He also reported that he did not see rioters damaging the Capitol but that he did see damage that had already been done. Mr. Ericson reported seeing police officers overrun by the crowd of rioters, although he said he did not see any officers being severely beaten or assaulted.

In the interview, Mr. Ericson also discussed his presence inside House Leader Nancy Pelosi's office space. He reported taking a beer from a refrigerator located outside the office. He claimed that, shortly after he did so, a SWAT operator came into the room and ordered all occupants to put their hands up. Ericson complied by dropping the beer, which shattered on the ground. After being ordered out of the Speaker's Office, Defendant Ericson went to the Rotunda before leaving the Capitol. After he left, he returned to his Airbnb to collect his belongings and drove back to Oklahoma with his friend. They arrived back to Oklahoma at approximately 7:00 a.m. on January 7, 2021.

Defendant Ericson told agents in the interview that he would not have entered the Capitol knowing what he knows now. He expressed his belief that the 2020 Presidential election was illegitimate and referenced a college paper he authored on the computer science involved in the election fraud he believes occurred.[3] Regarding the violence and destruction that occurred at the Capitol on January 6, Defendant Ericson stated he believed that the bad actors were members of Antifa dressed as supporters of former President Trump.

*The Charges and Plea Agreement*

On January 22, 2021, Andrew Ericson was arrested at his home in Muskogee, Oklahoma and charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 4, 2021, Andrew Ericson was charged by Information with the same four counts. On September 23, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in

---

[3] In the course of the investigation, law enforcement obtained the paper Defendant Ericson wrote alleging 2020 election tampering with Dominion voting systems.

a Capitol Building. In his plea agreement, Andrew Ericson agreed to pay $500 in restitution to the Architect of the Capitol.

**III.     Statutory Penalties**

The defendant now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). We therefore turn to these factors.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events. So, too, does the conviction this

8

defendant now faces. Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 is not like picketing at the Capitol some other day, without other rioters present.

While each defendant should be sentenced based on his or her individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol Building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Andrew Ericson's criminal acts began after he witnessed individuals scaling the exterior walls of the Capitol Building and, at some point along the way, he witnessed rioters overrun police officers. The defendant posted and streamed his enthusiastic participation in the riot on Snapchat. This started before he entered – taking video of the mob on the west front side of the Capitol – and continued once he was inside. He entered the west side of the Capitol at approximately 2:24 p.m. Although we do not know exactly what minute he exited, cell site data puts him in an area consistent with being inside the Capitol as late as 3:03 p.m. Defendant Ericson made it to several areas of the Capitol, including the Crypt, Rotunda, and United States House of Representatives Speaker's Conference Room (H-230). His most telling actions are those taken in the Speaker's Conference Room: posing for a photograph with his feet on the table, taking a photograph of himself in the mirror, and helping himself to a beer from the mini refrigerator. He also encountered desks and computers demonstrating he was intruding on office space. Based on his cheering noises throughout the video clips, Defendant Ericson appeared to be enjoying his participation. After the riot, the defendant removed the content of his Facebook and Snapchat accounts.

The government has no evidence that Andrew Ericson personally engaged in any violence or destruction of property or incited others to do so. However, the defendant admitted seeing signs of damage as well as police officers overrun by the crowd of rioters. Nevertheless, these things did not cause him to exit the Capitol.

After the riot, Andrew Ericson made incriminating statements to associates admitting he was present at the Capitol on January 6. In his interview with law enforcement after the entry of his plea, Mr. Ericson appeared to be forthcoming and provided additional factual information beyond what law enforcement already knew. The defendant conveyed his belief that the violence and destruction on January 6 was perpetrated by members of Antifa dressed as supporters of former

President Trump. He also said that he would not have entered the Capitol knowing what he knows now, a statement of contrition that appears to focus more on the consequences he has suffered than the nature of his conduct.

The nature and circumstances of the offense support a sentence of incarceration.

### B.  The History and Characteristics of the Defendant

Andrew Ericson is 24 years old and recently graduated with a Bachelor's degree in Computer Science, with a minor in Information Systems. *See* PSR at page 3, ⁋ 49. He reports experiencing a good childhood. *See* PSR at ⁋ 37. He has some prior exposure to the criminal justice system based on a charge of Possession of Marijuana, for which he was ordered to pay a fine. *See* PSR at ⁋ 26. He has also incurred traffic infractions. PSR at ⁋⁋ 28-29. The PSR also discusses the issues of mental health and narcotic use. PSR at ⁋⁋ 43, 45-48.

Mr. Ericson is currently working as a restaurant server in Tulsa, Oklahoma. PSR at ⁋ 52. He has previously worked in a variety of jobs, including as a manager at a waterpark, bartender, sales associate at Lowe's, pizza delivery driver, benefits counselor at Aflac, in the kitchen at Chipotle, sales associate at Ross Department Store, and for a law firm belonging to his grandfather and uncle. PSR at ⁋⁋ 53-61.

The defendant has been on pretrial release since his initial appearance in United States District Court for the District of Columbia. Mr. Ericson has not been fully complaint with his conditions of release, failing to check in as required on five occasions: the week of March 30, 2021; June 12, 2021; August 21, 2021; September 11, 2021; and September 25, 2021. *See* PSR at ⁋ 9.

The government also notes that, shortly after the government extended the misdemeanor plea offer to him, Mr. Ericson accepted it. The defendant should receive credit for that early

acceptance of responsibility, which the government has considered in making its sentencing recommendation.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although the government has no evidence that Andrew Ericson directly participated in violent or destructive behavior, his presence at the Capitol – along with that of all of the rioters – allowed January 6, 2021 to become the day it was. The defendant's decisions to enter the Capitol, to stay inside despite witnessing damage and police being overrun, and to act so cavalierly inside a sensitive area designated for the Speaker of the House, each presented an opportunity where the defendant could have reflected on the situation and chosen to remove himself. Throughout his approximately forty minutes within the Capitol Building, he broadcast his actions to others while cheering on and celebrating the rioters around him. The defendant has accepted responsibility for his actions by entering this plea agreement. He also said that he would not have entered the Capitol knowing what he knows now. However, his stated belief that the violence and destruction at the riot was perpetrated by members of Antifa dressed as supporters of former President Trump suggests a failure to acknowledge the full consequences of what happened on January 6, 2021. These considerations underscore the need for specific deterrence in this case, despite the consequences Defendant Ericson reported already facing of being incarcerated for four days, missing the first week of college classes, not walking with his college graduating class, and being terminated from his job. *See* PSR at ¶¶ 22, 54.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

14

Congress.[5] Each offender must be sentenced based on his or her individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences among defendants who participated in the Capitol breach on January 6, 2021. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

16

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69-71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors.

While no previously sentenced case contains the specific blend of aggravating and mitigating factors present here, the Court may consider the sentence imposed in *United States v. Matthew Mazzocco* (21-cr-54-TSC) for reference. Mazzocco pleaded guilty to the same charge as Defendant Ericson, 40 U.S.C. § 5104(e)(2)(G), and was sentenced to 45 days of incarceration, 60 hours[7] of community service, and $500 in restitution.[8] *See* 21-cr-54, ECF No. 34. Mazzocco entered a conference room in the Capitol known as the Spouse's Lounge. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing. 21-cr-54, ECF No. 28 at 6. Mazzocco also posed for a selfie-style photograph in front of rioters forcing their way into the Capitol. *Id.* at 2. Andrew Ericson posed for a selfie in the Speaker's Conference Room mirror as well for as a photograph resting his feet on the conference table. Rather than encouraging others to not take things, Defendant Ericson took a beer from a mini fridge. There are differences between the cases, such as the length of time each spent in the Capitol, but both Mazzocco and Defendant Ericson posted their involvement to social media (Ericson via video and photos, Mazzocco through a post saying "The capital is ours"); both deleted social media accounts on which they had posted incriminating evidence; both were aware of the crowd outside the Capitol, including individuals scaling the wall; and both expressed the belief that Antifa was to blame for the violence. *See id.* at 3, 7-8, 13.

---

[7] The government believes the Court's 10/4/2021 minute entry in 21-cr-54 is incorrect and the sentence requires 60 *hours* of community service, not 60 *months*.

[8] The government requested a sentence for Mazzocco of 3 months home detention, 36 months of probation, at least 60 hours of community service, and $500 in restitution. 21-cr-54, ECF No. 28 at 1.

The Court may also draw comparisons to the case of *United States v. Felipe Marquez* (21-cr-136-RC). Marquez pleaded guilty to one count of 18 U.S.C. § 1752(a)(2), Disorderly or Disruptive Conduct in a Restricted Building or Grounds. 21-cr-136, ECF No. 28 at 1. He is scheduled to be sentenced on December 10, 2021. 21-cr-136, ECF No. 23. In that case, the government has requested a sentence of four months of incarceration, one year of supervised release, and $500 in restitution. 21-cr-136, ECF No. 28 at 1. Like Defendant Ericson, Marquez entered sensitive office space within the Capitol. Marquez entered Senator Merkley's hideaway office and, with at least 20 other rioters in the room, sat at the senator's conference table and used his cell phone to film the room. *Id.* at 7-8. Marquez then held his vape pen up to the camera, as if to capture the rioters, himself included, smoking in a senator's office. *Id.* at 8. Marquez celebrated the success of the mob in scaling the Capitol's walls and breaching the Capitol interior, and he posted video to Snapchat of his time at the Capitol on January 6. *Id.* at 2, 26. Marquez's conduct has features warranting a longer sentence than that of Defendant Ericson (*i.e.*, Marquez was indicted on the felony charge of 18 U.S.C. § 1512(c)(2), Obstruction of an Official Proceeding), explaining the difference between the four months of incarceration requested for Marquez and the two months requested here for Defendant Ericson.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Andrew Ericson to 60 days of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      *Christine Macey*

CHRISTINE M. MACEY
D.C. Bar No. 1010730
Assistant United States Attorney
Fraud Section
U.S. Attorney's Office
555 4th Street, N.W., Room 5243
Washington, D.C.  20530
(202) 252-7058
Christine.Macey@usdoj.gov

Exhibit and Attachment List

Videos:
1. Exhibit 1 – Snapchat video outside the Capitol Building
2. Exhibit 2 – Snapchat video capturing entry into the Capitol Building
3. Exhibit 3 – Snapchat video outside and inside the Capitol Building
4. Exhibit 4 – Snapchat video in multiple areas inside the Capitol Building
5. Exhibit 5 – Snapchat video removing beer from refrigerator

*Note that the 5 videos are being provided via e-mail to the Court.*

*Note that the government does not object to the public release of any of the above videos.*

Attached Document:
1. Table 1 – Table of sentencing decisions