**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-000506-1(TNM)** |
| **ANDREW ERICSON,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Mr. Ericson, through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case.   After carefully reviewing the PSR with Mr. Ericson, he has minor objections that were sent to the probation officer and discussed in the final PSR. Mr. Ericson requests that this Honorable Court impose a sentence of time served with 40 hours community service to account for:

1.      His lack of need for incarceration, and

2.      His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

Mr. Ericson comes before the Court having plead guilty  to count 4 of the

Information  filed  charging him with a violation of Title 40 U.S.C.

§5104(e)(2)(G).   A sentence of time served with community service,  is a

reasonable  sentence that is "sufficient, but not greater than necessary" to address

the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a).  Under the

facts of this case, such a sentence will protect the public, provide just punishment,

and afford adequate deterrence.

1. **BACKGROUND**

    A.  **Mr. Ericson watches media coverage of The Black Lives Matter protests of 2020 and Trump denouncing the  2020 election**

The summer of 2020 was a violent one for major cities across the United

States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM").

After several months of being couped up because of Covid-19, people took to the

streets to protest the horrendous murder of George Floyd. Unfortunately, especially

in D.C., these protests turned violent.  These protests were widely televised on the

nightly news and other media outlets as a necessary process for vocal opposition to

systemic racism and the only way  racial justice could be effectuated.  Mr. Ericson

watched from his home in Oklahoma and on the internet as hundreds of businesses

across the nation were destroyed over a period of weeks, several people were

injured, and nearly two billion dollars of damage was done by rioters

nationwide.     https://www.washingtonpost.com/local/dc-braces-for-third-day-of-

protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html ;  https://nypost.com/2020/09/16/riots-following-george-floyds-death-could-cost-up-to-2b/.

After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle  began spreading the word that the election was "stolen" from him by Democrats and others.   https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html. False claims were made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned.  This Court can only understand why Mr. Ericson came from Oklahoma to D.C. when taking into account these two pivotal events in our nation's history. While consumption of media news is no excuse for behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country.  The media sets the tenor for how people feel about their rights and freedoms and can also plant notions of discontent or even outrage.  After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard.  Additionally, because it was reported that very few people were being prosecuted for their criminal behavior while violently protesting, (especially in the District of Columbia) which was replayed over and over again on the nightly

news, the media helped reinforce the notion that there would be little to no consequences for protestor

actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/. Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting  federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts.

*https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mr. Ericson, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020.   He saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media outlets for their strongly held beliefs.  And while most of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media framing… such

as disproportionate coverage of violent demonstrations."

https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

Mr. Ericson similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election and he believed the President when he said that the election had been stolen.   Mr. Ericson had recently become more aware of the political issues in our nation and emboldened by a new understanding of how vocal and peaceful protests were being conducted in our country to garner attention for important issues effecting the future of our nation.    Additionally, at

only age 23, Mr. Ericson had limited life experiences to inform what he saw happening in our nation and no experience in the procedures for conducting political rallies or protests other than what he had witnesses on media and through internet news sources.  He decided to come to D.C. to *peacefully* protest the results of the election and to show his support for President Trump.  He did so with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election.   He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothes.  Mr. Ericson committed no violent actions in his peaceful protest.  Mr. Ericson did not destroy anything. Mr. Ericson's only desire was to participate in a democratic process that is protected under the First Amendment to our Constitution. Unfortunately, going inside the Capitol was not part of that democratic process and he now stands before the Court after admitting  to the Court at his plea hearing that he knew going into the Capitol that day was wrong.

2.   **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

A.   **Mr. Ericson's trip to D.C. and his walk to the Capitol**

Mr. Ericson believed what he read on the internet and heard from the President himself - that the election had been stolen.   He believed that there was wrongdoing in elections across the country.   He also believed that he should show his support for the President by attending his rally and other rallies scheduled for

January 6, 2021, at the Ellipse on the Mall.   He had no idea about the procedural actions for the vote that day at the Capitol.  He had no idea it could be stopped or what that even meant.  He just wanted to add his voice to the protest and show his support for President Trump.

At the time, he was a college student, and like hundreds of thousands of other Americans, was suffering during the pandemic.  At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until President Trump's speech did he have any intention of  going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, had no real sense of where things were in relation to each other.  As the day unfolded, he never planned or envisioned entering the U.S. Capitol.  That is, not until President Trump invited everyone to march to the Capitol. Mr. Ericson followed the large crowd there that day with no intention of doing anything but having his voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Ericson is ashamed of the fact that he allowed himself to be swept up in the moment.

### B.  **Mr. Ericson's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President.   More than 30 minutes later, the Senate Wing Doors were penetrated by the crowd, pushing Capitol Police officers back into the inside corridor as they tried to prevent further intrusion.

Mr. Ericson was not in this first wave of hundreds of protesters.  He could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the Capitol. In fact,  Mr. Ericson had been so far behind the first people in that he had no idea how the door was opened or who opened it. He was a follower, not a leader.  There were thousands of other people there that day, most older than Mr. Ericson, most men and many taking leadership roles.  Mr. Ericson, by virtue of his young age, was very susceptible to the peer pressure imposed by these older men in the crowd.  These men were shouting at the crowd in an authoritative manner, encouraging participation, ordering people to move forward,

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

and some could say, demanding that the crowd obey.  When faced with this situation, Mr. Ericson succumbed to peer pressure and followed the crowd.  The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Ericson's knowledge and intention* as the day unfolded. That is, though many others were violent leaders of the mob, pushing officers, directing people to act with violence, and conducting violence themselves etc., Mr. Ericson was not violent nor did he intend to be so despite the actions of the others.

### C. Hindsight is 20/20.

Now, in retrospect, Mr. Ericson wishes he'd never come to D.C. at all, which is terribly sad because D.C. is a place all Americans should see and experience.  He never imagined going inside the Capitol and certainly never thought that violence would follow.   Importantly, Mr. Ericson did not have any intention of stopping the vote.  Indeed, Mr. Ericson's aimless following of the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate.

Mr. Ericson's only intention that day was to have his voice heard.   There is not a scintilla of evidence produced by the government or otherwise that he had

any intention to stop the vote, that he went to the Capitol with the express purpose of stopping the vote, that he even knew where the vote even took place within the Capitol that day, and that others were there to stop it. In fact, Mr. Ericson had no idea where he was while he was in the Capitol and to this day could not find his way around if given the opportunity.

### D. <u>The Charges and the arrest of Mr. Ericson</u>

On January 20, 2021, a  sealed criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Ericson with four misdemeanor offenses related to his conduct on January 6. See ECF No. 1.[2]  On January 22nd, Mr. Ericson was arrested at the home he shares with his elderly grandmother at 6 am in the morning, *a la* Roger Stone.        *See* ECF  entry of January 22, 2021. Approximately 20 armed agents surrounded his home and loudly and violently arrested Mr. Ericson, a young college student who had negligible criminal history- traffic tickets and a possible  juvenile marijuana possession.  He lived in the home with his elderly grandmother. Not surprisingly, she too had no criminal history. The agents took every piece of technology items in the home, even the grandmother's pink laptop and phone, even though they were told at the time that they did not belong to Mr. Ericson.  Unfortunately, January 22nd was a Friday, and

---

[2] Those four charges are: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Mr. Ericson spent the next 4 days in the county jail.  In undersigned counsel's experience, this was absolutely planned by the FBI so that Mr. Ericson would have to spend the long MLK weekend behind bars.  Mr. Ericson had an initial appearance in the U.S. District Court for Oklahoma on January 26, 2021, after spending 4 days in jail. He then made his initial appearance  in the District of Columbia  on January 29 , 2021, and, again, was released on personal recognizance with conditions. *See* ECF No. 9. On March 5, 2021, Mr. Ericson appeared before this Honorable Court for arraignment via video conference. He entered a plea of not guilty. He later entered a plea of guilty again via video conference before this Honorable Court on September 23, 2021. *See* ECF #27-29.

## II.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;
2.  The need for the sentence imposed;
3.  The kinds of sentences available;
4.  The kinds of sentence and the sentencing range…;
5.   Any pertinent policy statements issued by the Sentencing Commission;
6.  The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.  The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Ericson

After Mr. Ericson walked freely into the Capitol he was impressed by the

grandeur of the building.  He had never been to the Capitol before.  Compared to

many other class B misdemeanor cases that have been filed in this Court, Mr.

Ericson's conduct is at the bottom of the scale.  First, the defense is not aware of

any evidence that defendant's entry into the Capitol was preplanned or coordinated

with anyone else, including any extremist or organized groups. His intention was to attend the rally and that did not include going into the Capitol.  Second, the defense is not aware of any evidence that the Defendant incited others to commit acts of violence or destruction. Third, the defense is not aware of any evidence that Mr. Ericson engaged in any violence or questionable conduct towards law enforcement. In fact, it's just the opposite. Mr. Ericson told the FBI that every interaction he personally had with the police was a positive experience.   When Mr. Ericson was asked to leave the building, he immediately made efforts to get out. He didn't have to be asked twice and he didn't delay or try to avoid detection. In fact, Mr. Ericson went to officers and asked for help in finding the exit as the chaos made it difficult to know how or where to exit the building.  Fourth, the defense is not aware of any evidence that Mr. Ericson destroyed or stole any property from the Capitol. He did attempt to take a picture with the beer he found in the outer office of Nancy Pelosi.  It was a beer labeled "Corona" and in his youthful sense of humor, he found it ironic that with the corona virus raging in the United States the lawmakers in charge of our country were drinking coronas at work.  As soon as he snapped the picture, officers arrived to his location and asked him and others in the area to leave.  He immediately complied and began searching for a way out of the building.  Fifth, based on the Government's investigation, it appears that the Mr. Ericson remained in the Capitol building for a limited period of time.  The defense

is not aware of any evidence that Mr. Ericson entered any rooms or offices in the Capitol, any personal space or the Senate or House Chamber, other than the outer office of Speaker Pelosi where the Corona beer was found.

To his credit, Mr. Ericson voluntarily answered all questions by the police when arrested. He later fully acknowledged his misconduct by answering pointed questions by the FBI agents in a post-plea interview, expressed true and full contrition, and voluntarily offered to unlock his phone.  Additionally,  when he was arrested, he gave over all his clothing he wore on January 6th  and his thumbprint to open his computer during the search of his home he shared with his Grandmother.   This search was particularly traumatizing for his family, especially his Grandmother, who had recently lost her husband to cancer and for whom Mr. Ericson had moved in to help care for during his illness.  Approximately 20 officers arrived at the crack of dawn and descended upon the home.  They confiscated all the electronics in the house, not just Mr. Ericson's, but also his Grandmother's electronics and the electronics of her dead husband.  Among the objects they took were her pink laptop and USB drives clearly labeled as bible study materials.  All told, they spent approximately 6 hours at the house conducting the search, thus making sure the neighborhood was fully awake to witness the line of SUVs and officers outside the home and fully aware of the operation to arrest her grandson.  Mr. Ericson was taken to jail that day after the

first couple hours of the search, which continued until afternoon.  While this was a traumatizing experience for Mr. Ericson and his family, in showing maturity beyond his years, he has expressed that he was relieved by the opportunity to take responsibility for his actions.

Mr. Ericson did not come to Washington with the intention of subverting democracy. Mr. Ericson came to Washington to peacefully protest what he believed at that time to be a fraudulent election.   By the time Mr. Ericson arrived at the U.S. Capitol, well after  2:00 p.m., the barriers that had been erected along the perimeter of the building were no longer present. Mr. Ericson met no resistance in his walk to and inside the Capitol. At the time,  Mr. Ericson didn't dream he'd be charged for going into the Capitol.  After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mr. Ericson  cringe. He did not witness any of  this at all. He is left with deep regret, fear, shame, and remorse.

The government concedes that Mr. Ericson committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful, even grateful.

Importantly, when Mr. Ericson entered the Capitol, there were no police officers telling him not to go up the steps.  Once he realized he should leave, he did. Despite his overwhelming and continuing cooperation with the government, the government now seeks to minimize Mr. Ericson's acceptance of responsibility because he does walk "in lock step" with the government's theory regarding each and every fact and the reason for each and every action he took on January 6th. The government's position hardly sets an example for those in the future who would seek to "do the right thing" by offering to cooperate and plead guilty in a timely matter such as the instant one.

This has been a long road for Mr. Ericson and his family.  At the time of the offense, he was a senior in college. The college he attended sent him a letter telling him he was going to be expelled for his behavior on January 6, 2021. Only after undersigned counsel wrote a letter to the school explaining due process did they relent and let Mr. Ericson graduate. He has been threatened on social media-specifically on "Linked In" by adults, not children. Fortunately, he has a supportive relationship with his immediate family who has stood by him since the beginning of this case and a supportive extended family.   Mr. Ericson pled guilty at an early stage in the proceedings thus saving valuable judicial resources.[3] It is of utmost importance

---

[3] Notably, the criminal complaint filed in this case is full of errors. For example, the FBI agent affiant  has a confidential informant giving him information but that CI is never identified, and the information the CI gives him is inaccurate. Mr. Ericson was not in fact technically "live streaming" and Mr. Ericson was never in "Nancy Pelosi's

to Mr. Ericson that this Court understand that  he is incredibly remorseful for his actions on January 6, 2021. There is no doubt that, as he expressed when interviewed by law enforcement, he wishes he had never come to Washington, D.C. on that day. None of this will be erased from the internet. It's there forever.  He has fully accepted responsibility for his bad judgement in entering the  Capitol building by pleading guilty in what can be described as the "first wave" of defendants that pled guilty.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  His Grandmother and his family have been traumatized by the way in which law enforcement conducted the search and made his initial arrest.  Still, he has had no trouble with the law and continues to show remorse and sincere regret for getting involved with President Trump's call to the Capitol that day.

Mr. Ericson does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there.  Most telling about Mr. Ericson is despite all he has been through, he is working full time now in a very good job in his field of study.   Finding a job right out of college in your chosen field is a true

---

office."  This CI says that  he "did hear ERICSON screaming and yelling during the livestream" yet fails to identify what Mr. Ericson allegedly screamed and yelled. *See* Criminal Complaint, paragraphs 20-21, ECF No. 1.

accomplishment for any college student, especially in the difficult year our nation has experienced with the pandemic.  This is an opportunity for Mr. Ericson that can set his life on a path to adulthood.  He started this job on November 22, 2021 and is working remotely at the moment.  Keeping him on this path is important to helping him attain the maturity he needs to be a productive citizen in the future. His law abiding past and his post arrest behavior show that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of time served considering the 3553 factors.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily

harsh sentences imposed upon those who were less culpable will not encourage

respect for the law or promote just punishment, but are likely to  be

counterproductive, and labeled as political posturing.  A sentence of  time served

does constitute punishment  and  if the Court instead gives a term of probation, it

will deter others as one's liberty interests are curtailed by travel restrictions,

reporting obligations, and limitations on one's personal freedoms. The National

Institute of Justice, Department of Justice, issued a summary of the current state of

empirical research stating that "prison sentences are unlikely to deter future

crime," and "increasing the severity of punishment does little to deter crime."  U.S.

Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to

Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the

Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

**2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

Mr. Ericson's likelihood of recidivism is very low. He has expressed

genuine remorse and contrition, has cooperated fully with law enforcement,  turned

over evidence voluntarily, and  accepted the first plea offer tendered with no

hesitation. His acceptance of responsibility was complete and without reservation.

He has never tried to minimize his behavior.   Research has consistently shown that

while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Mr. Ericson's  current age (24), and other issues consistent with what is mentioned above, the likelihood of Mr. Ericson ever re-offending is as close to zero as one might come. A  punishment of any jail time  in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve

bed space for individuals from which society would need greater protection and would serve the ends of justice. Mr. Ericson urges the Court impose a sentence of time served with community service in this case and impose a probationary sentence in light of his significant family obligations, his sincere and complete remorse, his early and consistent acceptance of responsibility, and the lack of a need to further deter him.[4]

### C. The kinds of sentences available

The sentencing guidelines do not apply  in this case.  *See* PSR, paragraph 69. The Court should not consider any conduct that Mr. Ericson did not plead guilty to. If this Court were to adopt the government's recommendation, as opposed to that of the Probation Office, it would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[5]

Largely because of his obligation to his grandmother and his law abiding nature, Mr. Ericson asks that the Court adopt the recommendation of the U.S. Probation Office and impose a sentence of time served. In the alternative, he asks that the Court consider a non-custodial sentence with a restriction that he remain on his property except for work and excused absences.  This would be particularly

---

[4] For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,*  at 29 (May 2004).
[5] This does not include every case, just a sampling.

appropriate given his new job and the harsh punishment a custodial sentence would impose by potentially causing him to lose his first post college employment during a pandemic.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is such that he cannot pay any significant fine.  *See* PSR, paragraph 67; U.S.S.G. **§ 5E1.2(a)** (fine not recommended if defendant unable to pay).

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than time served, a probationary term, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.  The following cases are a sampling where a misdemeanor was charged and pled to and resulted in no incarceration:

**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);
**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);
**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);
**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-

00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.
**United States v. Andrew Bennett, Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify. There is nothing materially different about Mr. Ericson or his conduct that would justify a sentence of incarceration and such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, the Honorable Judge Boasberg sentenced both defendants to 45 days of incarceration. However, in that case, unlike Mr. Ericson's, the prosecutors asked for four (4) months of

incarceration for each defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mr. Ericson, was on probation at the time of his offense on January 6 for domestic violence. Additionally, Judge Chutkan  recently sentenced another January 6 defendant to 45 days of incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(October 4, 2021). However, Mr. Mazzocco blamed the violence that day on Antifa, deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. See https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/ In *United States. v. Reeder*, 21 CR 166(TFH), Judge Hogan sentenced Mr. Reeder to 90 days incarceration because he bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about his actions and deleted social media accounts, and most importantly, put his hands on a police officer.

Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances.

 *Cf: United States v. Glenn Croy*, 21-cr-162(BAH) defendant sentenced to 36 month's probation, 14 days in a ½ way house and 90 days home detention. Here, Mr. Croy entered the Capitol not once but twice, engaged in yelling at police officers and was situated in the Capitol in such a way to breach police lines at critical junctures.

Mr. Ericson was far more cooperative with law enforcement than many of these other defendants, did not attempt to hide any evidence,  in fact produced evidence when asked and has not publicly blamed another group for the violence that day.  All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Ericson's conduct and characteristics. Mr. Ericson's actions fall on the low-end of the spectrum that day and his culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.

## IV. CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Ericson respectfully moves this court to impose a sentence of time served with community service hours.   This sentence  is "sufficient but not greater than necessary" as

required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of

federal judicial discretion, that would consider Mr. Ericson as an individual and

account for his unique failings and positive attributes that, in the words of Justice

Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment

to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing*

*Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By: _____/s/_____

KIRA ANNE WEST
DC Bar No. 993523
712 H. St NE, Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 3rd  day of December, 2021 a copy of same was delivered to the parties of record, by email  pursuant to the Covid standing order and the  rules of the Clerk of Court.

_____ /S/
Kira Anne West